## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

RUTHY PARNES, Derivatively on Behalf of
MONSTER WORLDWIDE INC.,

Plaintiff,

v.

ANDREW J. MCKELVEY, GEORGE R.
EISELE, JOHN R. GAULDING, JOHN
SWANN, MICHAEL KAUFMAN,
RONALD J. KRAMER, DAVID A. STEIN,
JAMES J. TREACY, JEFFREY C.
TAYLOR, THOMAS G. COLLISON, PAUL
M. CAMARA, and JOHN MCLAUGHLIN,

Defendants,

and

MONSTER WORLDWIDE INC.,

Nominal Defendant.



JUDGE BUCHWALD

06 CV 4622

Civil Action No.

**JURY TRIAL DEMANDED**

RECEIVED
JUN 15 2006
U.S.D.C. S.D. N.Y.
CASHIERS

## VERIFIED DERIVATIVE ACTION COMPLAINT

Plaintiff, Ruthy Parnes, by and through her attorneys, derivatively on behalf of Monster

Worldwide Inc. ("Monster" or the "Company"), alleges upon personal knowledge as to herself

and her own acts, and upon information and belief as to all other matters, based upon, *inter alia*,

the investigation conducted by and through her attorneys, which included, among other things, a

review of Securities and Exchange Commission ("SEC") filings, news reports, press releases,

and other publicly available documents regarding Monster as follows:

## SUMMARY

1.     Plaintiff, derivatively on behalf of Nominal Defendant Monster, seeks relief for the damages sustained, and to be sustained by Monster, against certain current and former top executives and the current members of its Board of Directors for violations of state and federal law, including their breaches of fiduciary duties, gross mismanagement, unjust enrichment, and violations of Sections 10(b) and 14(a) of the Securities and Exchange Act of 1934 (the "Exchange Act"), which occurred between January 1, 1997 and the present (the "Relevant Period").

2.     The Options Defendants have engaged in certain transactions, including the exercise of back-dated options, to reap millions of dollars in unlawful windfall profits at the expense of the Company.

3.     A stock option granted to an employee of a corporation allows the employee to purchase company stock at a specified price – referred to as the "exercise price" – for a specified period of time.  Stock options are granted as part of employees' compensation packages to create incentives for them to boost profitability and stock value. When an employee exercises an option, he or she purchases the stock from the company at the exercise price, regardless of the stock's price at the time the option is exercised.

4.     The unlawful conduct occurred while Director Defendants were directing the Company.  These Director Defendants authorized or failed to halt the back-dating of options in dereliction of their fiduciary duties to the Company as directors, thus causing or allowing the Company to suffer many millions of dollars in harm.

5.     Under the Company's stock options plans, options are required to be priced at the price of the Company stock on the day of the grant.  If an option is back-dated to a day on which

a market price was lower than the price on the day the option is granted, then the employee pays less and the company gets less money for the stock when the option is exercised. Furthermore, the purchaser of the option gets a greater compensation than that to which he or she is entitled. Such conduct is unlawful.

6.      On June 12, 2006, Monster said it has received a subpoena from the Office of the U.S. Attorney for the Southern District of New York related to the company's granting of stock options. This news shocked the market and caused the price of the common stock to fall 8.1 percent from a closing price of $42.00 on Friday June 9, 2006, to a close of $38.60 on Monday June 12, 2006.

7.      Back-dating the options violated Monster's stock option plans. Back-dating the options also breached of Defendants' fiduciary duties of care, loyalty, and good faith to Monster.

8.      Defendants' conduct has unjustly enriched Monster's top executives, including Defendants Treacy, Collison, Taylor, Camara and McLoughlin, and has exposed the Company to great expense and liability, to the detriment of Monster and its shareholders.

## PARTIES

### Plaintiff

9.      Plaintiff Ruthy Parnes is a citizen of New York and has owned Monster stock throughout the Relevant Period, and continues to own the Company's common stock.

10.      As a current holder of Monster common stock and a holder during the period of the wrongs alleged herein, and pursuant to Fed. R. Civ. P. 23.1, Plaintiff has standing to assert these claims on behalf of the Company and will fairly and adequately protect the interests of the Company and its other stockholders.

3

**The Director Defendants**

11.     Defendant Andrew J. McKelvey ("McKelvey") is the Chairman of the Board, CEO and a Director since founding the Company in 1967.

12.     Defendant George R. Eisele ("Eisele") has been a Director of the Company since September 1987.  Mr. Eisele was the Executive Vice President of TMP Direct, the Company's direct marketing business unit from 1989 until May 2, 2005 when the business unit was sold to GECKO Inc., an entity owned 65% by Mr. Eisele.  Following its sale by the Company, Mr. Eisele continues to head TMP Direct as its Chief Executive Officer.

13.     Defendant John R. Gaulding ("Gaulding") has been a Director of the Company since June 2001.  Mr. Gaulding is a member of the Company's audit committee and compensation committee.

14.     Defendant John Swann ("Swann") has been a Director of the Company since September 1996.  Mr. Swann is a member of the Company's compensation committee and nominating committee.

15.     Defendant Michael Kaufman ("Kaufman") has been a Director of the Company since October 1997.  Mr. Kaufman is Chairman of the Company's compensation committee and a member of its audit committee.

16.     Defendant Ronald J. Kramer ("Kramer") has been a Director of the Company since February 2000.  Mr. Kramer is Chairman of the Company's audit committee and a member of its compensation committee.

17.     Defendant David A. Stein ("Stein") has been a Director of the Company since June 2003.  Mr. Stein is Chairman of the Company's nominating committee.

18.     Defendants McKelvey, Eisele, Gaulding, Swann, Kaufman, Kramer, and Stein are hereinafter collectively referred to as the "Director Defendants."

**The Options Defendants**

19.     Defendant James J. Treacy ("Treacy") joined Monster in 1994 as chief executive officer of the Advertising and Communications Division.  In April 1996, Mr. Treacy was named Executive Vice President—Finance and Strategy.  In February 1998, in addition to his then current position, Mr. Treacy was named Chief Operating Officer.  In October 1998, he became a director of the Company.  Mr. Treacy left employment at Monster in 2002.

20.     Defendant Jeffrey C. Taylor ("Taylor") joined the Company in November 1995. Mr. Taylor was founder and president of Adion, Inc., a recruitment advertising firm, from May 1989 until its purchase by the Company in November 1995. Mr. Taylor founded The Monster Board in April 1994 and launched TMP Interactive in 1995.  Mr. Taylor left his employment at the Company in June 2005.

21.     Defendant Thomas G. Collison ("Collison") is the former Vice Chairman and Secretary of the Company.  He joined the Company in February 1977 as Controller.  He was subsequently named Vice President-Finance, Senior Vice President, Executive Vice President and Chief Financial Officer and in March 1996, Vice Chairman.

22.     Defendant Paul M. Camara ("Camara") joined the Company in February 1970. Mr. Camara was elected as a Vice President of the Company in 1978 and as a Senior Vice President in 1987. He was named to his current position, Executive Vice President of Creative, Sales, & Marketing, in April 1996.

23.     Defendant John McLaughlin is currently the Executive Vice President of Monster.  He is a 19-year veteran of Monster Worldwide and predecessor companies, Mr.

McLaughlin is responsible for the human capital management practices and policies of the organization and reports to Defendant McKelvey.

24.     Defendants Treacy, Taylor, Collison, Camara and McLoughlin are hereinafter collectively referred to as the "Options Defendants."

**The Nominal Defendant**

25.     Nominal Defendant Monster is a Delaware corporation with its corporate headquarters at 622 Third Avenue, 39th Floor, New York, NY 10017.  According to the Company's website, it is the parent company of Monster, the leading global online careers property that's changing the way people look for jobs and the way employers look for people. The Company also owns TMP Worldwide Advertising & Communications, one of the largest Recruitment Advertising agencies in North America.  Monster trades on the Nasdaq under the symbol "MNST."

## JURISDICTION AND VENUE

26.     This Court has jurisdiction over all claims asserted herein pursuant to 28 U.S.C. § 1331 because Plaintiff's claims arise in part under the Constitution and the laws of the United States. This Court also has supplemental jurisdiction pursuant to 28 U.S.C. §1367(a). Jurisdiction over the subject matter of this action is also conferred upon this Court by Section 27 of the Exchange Act, 15 U.S.C. Section 78aa.  This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

27.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(a)(1) because one or more of Defendants either resides or maintains executives offices in this Judicial District, and a substantial portion the acts and transactions constituting the violations of law alleged in this Complaint occurred in substantial part in this Judicial District.  Moreover, Defendants have received substantial compensation in this Judicial

District by doing business here and engaging in numerous activities that had an effect in this Judicial District.

## SUBSTANTIVE ALLEGATIONS

### Obligations and Duties of the Defendants

28.     By reason of their positions as directors, officers, and/or fiduciaries of Monster and because of their ability to control the business, corporate and financial affairs of the Company, each of the Defendants owed Monster the duty to exercise due care and diligence in the management and administration of the affairs of the Company and in the use and preservation of its property and assets, and owed the duty of loyalty, including full and candid disclosure of all material facts related thereto.  Further, Defendants owed a duty to Monster to ensure that Monster operated in compliance with all applicable federal and state laws, rules, and regulations, and that Monster not engage in any unsafe, unsound, or illegal business practices. The conduct of Defendants complained of herein involves knowing violations of their duties as directors of Monster, and the absence of good faith on their part, which Defendants were aware or should have been aware, posed a risk of serious injury to Monster.

29.     To discharge these duties, Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices, controls, and financial and corporate affairs of Monster.  By virtue of this obligation of ordinary care and diligence, Defendants were required, among other things, to:

> a.      manage, conduct, supervise, and direct the employees, businesses and affairs of Monster in accordance with laws, rules and regulations, and the charter and by-laws of Monster;
>
> b.      neither violate nor knowingly or recklessly permit any officer, director or employee of Monster to violate applicable laws, rules and regulations, and to exercise reasonable control and supervision over such officers and employees;

ensure the prudence and soundness of policies and practices undertaken or proposed to be undertaken by Monster;

c.     remain informed as to how Monster was, in fact, operating, and upon receiving notice or information of unsafe, imprudent or unsound practices, to make reasonable investigation in connection therewith and to take steps to correct that condition or practice, including, but not limited to, maintaining and implementing an adequate system of financial controls to gather and report information internally, to allow Defendants to perform their oversight function properly to prevent the use of non-public corporate information for personal profit;

d.     supervise the preparation, filing and/or dissemination of any SEC filing, press releases, audits, reports or other information disseminated by Monster, and to examine and evaluate any reports of examinations or investigations concerning the practices, products or conduct of officers of Monster, and to make full and accurate disclosure of all material facts, concerning *inter alia*, each of the subjects and duties set forth above; and

e.     preserve and enhance Monster's reputation as befits a public corporation and to maintain public trust and confidence in Monster as a prudently managed institution fully capable of meeting its duties and obligations.

30.     Defendants breached their duties of loyalty, due care and/or good faith by allowing Defendants to cause, or by themselves causing, the Company to unlawfully grant stock options and to misrepresent its financial results, as detailed herein, and/or by failing to prevent Defendants from taking such illegal actions.

**The Company's Stock Option Plans**

31.     The Company's 1996 Stock Option Plan (the "1996 Plan") provides for the issuance of both incentive stock options and stock options that are not treated as an incentive stock option. The per share exercise price of an incentive stock option granted under the 1996 Plan *may not be less than the fair market value* of the Common Stock of the Company on the date of grant. Incentive stock options granted to persons who have voting control over 10% or more of the Company's capital stock are granted at an exercise price of not less than 110% of the fair market value of the underlying shares on the date of the grant.  The exercise price of stock

options that are not treated as incentive stock options granted under the 1996 Plan *may not be less than the fair market value* of the Common Stock of the Company on the date of the grant.

32.     The 1996 Plan provides a Committee of the Board of Directors with the sole and absolute discretion to grant options under the 1996 Plan, to interpret the provisions of the 1996 Plan, to fix and interpret the provisions of options agreements made under the Plan, to supervise the administration of the Plan, and to take such other action as may be necessary or desirable in order to carry out the provisions of the 1996 Plan.  Options granted under the 1996 Plan have a maximum term of ten years.  Awards granted under the 1996 Plan will be evidenced by agreements consistent with the 1996 Plan.

33.     Under the Company's 1999 Long Term Incentive Plan, the Compensation Committee may grant both incentive stock options and stock options that do not qualify as incentive stock options.  The per share exercise price of an incentive stock option granted under the 1996 Plan *may not be less than the fair market value* of the Common Stock of the Company on the date of grant. Incentive stock options granted to persons who have voting control over 10% or more of the Company's capital stock are granted at an exercise price of not less than 110% of the fair market value of the underlying shares on the date of the grant.  The exercise price of stock options that are not treated as incentive stock options granted under the 1999 Plan *may not be less than the fair market value* of the Common Stock of the Company on the date of the grant.

34.     Options granted under the 1999 Plan have a maximum term of ten years.  Unless the Compensation Committee determines otherwise, no option may be exercised within six months after the date the option is granted and each option is subject to a four-year vesting

schedule pursuant to which the option will generally become 25% vested on each of the first four anniversaries of the date of grant, subject to continued employment.

**Defendants Back-dated and Otherwise Manipulated Stock Option Grants**

35.    On June 12, 2006, the *Wall Street Journal* published an article titled, "Monster Worldwide Gave Officials Options Ahead of Share Run-Ups." This article explained that four out of the seven grants given to former Monster executive, Defendant Treacy were suspicious. More specifically, one of the grants was made on the stock's lowest closing price of 1997 and three others were made on the quarterly low. Also on June 12, 2006, the Company announced that a committee of "independent directors" of the Company has been conducting an internal review and analysis of all stock option grants previously issued by the Company. This committee has retained independent outside legal counsel to assist in this matter.

36.    Also on June 12, 2006, Monster announced that it received a subpoena from the United States Attorney for the Southern District of New York related to the stock option grants. On June 14, 2006, the Company further disclosed that it was the subject of our SEC investigation concerning the back-dating of stock option grants.

37.    According to the *Wall Street Journal*, Defendant McKelvey, acknowledged that he is "completely responsible," as the company's most senior executive, for option grants to everyone else. He said Monster has begun a review to determine why the grants were often priced at lows. Monster's board has also begun a review.

38.    A closer review of the Company' option grants shows that Defendant Treacy was not the only executive to receive suspicious grants:

> a.    In 1997, the Company granted Defendants Treacy, Taylor, Collison and Camara each two options grants. One was allegedly granted on January 6, 1997, at an exercise price of $12.88, the *yearly* low and the

second was purportedly granted on December 12, 1997 at an exercise price of $15.00, the *quarterly* low.

b.      All of the Company's 1998 grants to top executives allegedly occurred on December 9, 1998 at an exercise price of $26.88.  These alleged grants followed a decline in the stock price from $32.88 on November 27, 1998 and preceded a rise in the price to the *quarterly* high on December 31, 1998 of $42.00.

c.      In 1999, the Company allegedly granted Defendants Treacy and Camara stock options on August 5, 1999 at an exercise price of $22.06, the *quarterly* low.

d.      The suspicious grants continued, and in 2001, the Company purportedly granted Defendants Treacy and Mclaughlin stock options on April 4, 2001, at an exercise price of $30.63, the *quarterly* low.  Further, the Company's alleged grant to Defendants Treacy and Mclaughlin on November 1, 2001 at an exercise price of $27.50 followed a steep decline in the stock from $48.15 on August 27, 2001 and preceded a sharp rise to the *quarterly* high of $48.13 on December 6, 2001.

39.      According to the *Wall Street Journal* there is about a ***one in nine million chance*** that such a favorable pattern of grants would occur to Defendant Treacy if the dates were selected randomly, i.e. without regard to the stock price.  The following charts, originally printed in the *Wall Street Journal*, show the stock price two months before and two months after selected stock option grants to Defendant Treacy.  This chart demonstrates the extremely suspicious nature of these grants:

**Examples of options granted** *(Stock prices adjusted for splits)* ◯ Date of grant



**The Consequences**

40.    As a result of the back-dating and other manipulation of options issued to the Options Defendants, they have been unjustly enriched by many millions of dollars at the expense of the Company.  The Company has received and will receive less money from the Options Defendants when they exercise their options at prices substantially lower than they would have if the options had not been back-dated.

41.    The practice of back-dating stock options not only lined the pockets of the Options Defendants at the direct expense of the Company, but also resulted in the overstatement of the Company's profits.  This is because options priced below the stock's fair market value when they were awarded brought the recipient an instant paper gain that must be accounted for as additional compensation and treated as an expense to the Company.  The Company's failure to do so violated Generally Accepted Accounting Principles ("GAAP").  The Company must account for the options at a lower price, and may have to restate its results to reflect the previously unreported expenses.

42.    The practice of back-dating options has caused the Company to suffer additional adverse consequences, including (i) the drop in its stock price attributable to the market's loss of confidence in the Company's management, thus increasing the Company's cost of borrowing and otherwise harming its operations, and (ii) exposure to the cost of defending against and potential liability for regulatory actions and private securities class actions.

**The Monster Board**

43.    During the Relevant Period, the Company, through the actions of its Board of Directors and its Compensation Committee, granted stock options for the purchase of millions of shares of the Company's common stock along with certain other perquisites to the Options Defendants.

44.     Director Defendants misrepresented and actively concealed and caused the Company to misrepresent and actively conceal in public SEC filings that the stock options were priced at no less than the fair market value of the stock on the date of the grant, thereby affirmatively concealing the claims set forth herein. The stock option plans, referenced above, were exhibits that were incorporated by reference each year in the Company's Annual Reports on Form 10-K. Also, the Options Defendants' compensation, including their stock option grants, were disclosed in the Company's yearly proxy statements promulgated in connection with the Company's annual meetings.  Director Defendants' misrepresentations about their stock option pricing practices were known to be false or were made in reckless disregard of its truth or falsity. The concealment of these practices could not have been discovered through reasonable diligence by the typical shareholder, prior to the June 12, 2006 *Wall Street Journal* article and subsequent announcement of the subpoena from the Office of the U.S. Attorney for the Southern District of New York.

45.     Contrary to the foregoing contractual provisions and public disclosures, as shown by the highly favorable pattern of stock options grants, the stock options were not, in fact, priced on the date of the grant, but were in fact back-dated, or were granted at a low price in complete disregard of the actual price of the stock on the day of the grant.

46.     Director Defendants stood in a fiduciary relationship with the Company's shareholders and thereby owed them duties of due care and loyalty. These duties require the Board to act in good faith, with the care an ordinarily prudent person in a like position would exercise under similar circumstances, and in a manner he or she reasonably believes to be in the best interest of the Company and its shareholders.

47.     Director Defendants violated their fiduciary duties to the Company by failing to act with due care, loyalty and good faith when they either expressly authorized the practice of back-dating options, or in conscious abrogation of their fiduciary duties, permitted it to occur.

48.     Instead of properly disclosing these improper stock option backdating practices and the corresponding understatement of compensation costs, Director Defendants caused or allowed these practices to continue unabated throughout the Relevant Period.

49.     Director Defendants' breaches of their fiduciary duties have exposed the Company to a number of harms including: the expense of internal investigation; the expense of SEC investigations; the potential liability under tax laws and federal securities laws; the possibility of having to restate financial results; and liability to stock purchasers.

**Committees of the Board**

50.     The standing committees of the Monster Board include: (i) the Audit Committee; and (ii) the Compensation Committee.

*Compensation Committee*

51.     Defendants Kaufman, Gaulding, Kramer and Swann were members of the Compensation Committee during the Relevant Period.   The Compensation Committee was established for the primary purpose of: (i) discharging the Board's responsibilities in respect of compensation of the Corporation's executive officers, including approving individual executive officer compensation, (ii) overseeing the Corporation's overall compensation and benefit philosophies, and (iii) producing an annual report on executive compensation for inclusion in the Corporation's proxy statement, in accordance with applicable rules and regulations.

52.     The Compensation Committee is responsible for, *inter alia*, fixing and determining awards to officers and employees of stock, stock options, shares of stock, stock

appreciation rights and other equity interests pursuant to any of the Corporation's equity compensation plans from time to time in effect and exercise such other power and authority as may be permitted or required under such plans.

53.    Accordingly, the members of Monster's Compensation Committee are responsible for administering the issuance of option grants under the 1996 Plan and the 1999 Plan. Therefore, Defendants Kaufman, Gaulding, Kramer and Swann were responsible for reviewing the stock options grants to Monster executives.  These Defendants did not fulfill this duty, therefore causing or allowing the Company's executives to obtain unreasonable and unreported compensation via the backdating of stock option grants.

***Audit Committee***

54.    Defendants Gaulding, Kaufman and Kramer were members of the Audit Committee during the Relevant Period.  Defendant Kramer is currently the Audit Committee Chair.  As members of the Audit Committee, Defendants Gaulding, Kaufman and Kramer had a special duty to know and understand this material information regarding the stock option grants as set out in the Audit Committee's charter, which charges the Audit Committee with the responsibility for (1) reviewing the Company's annual audited financial statements and quarterly financial statements and (2) periodically discussing with the chief executive officer and chief financial officer (a) significant deficiencies in the design or operation of the internal controls that could adversely affect the Company's ability to record, process, summarize and report financial data and (b) any fraud that involves management or other employees who have a significant role in the Company's internal controls.

55.    Under the Audit Committee Charter, the responsibilities of the Audit Committee shall include, *inter alia,* (a) assisting the Board in its oversight responsibilities regarding (1) the

integrity of the Company's financial statements, (2) the Company's compliance with legal and regulatory requirements, (3) the independent accountants' qualifications and independence and (4) the performance of the Company's internal audit function; (b) preparing the report required by the United States Securities and Exchange Commission for inclusion in the Company's annual proxy statement; (c) retaining and terminating the Company's independent accountants; (d) approving audit and non-audit services to be performed by the independent accountants; and (e) performing such other functions as the Board may from time to time assign to the Committee. In performing its duties, the Committee shall seek to maintain an effective working relationship with the Board, the independent accountants, the internal auditors and management of the Company.

56.     The members of the Audit Committee knew or should have known that Monster's financial statements were inaccurate and certain stock option grants were improper, and thereby permitted or condoned the unlawful practices described herein.   Accordingly, Defendants Gaulding, Kaufman and Kramer, through their improper execution of their duties and responsibilities as members of the Monster Audit Committee, knew of or recklessly disregarded the unlawful practices at Monster described herein.

57.     The improper dating of stock option grants, in turn, caused a misstatement of Monster's earnings because the compensation costs in connection with the misdated options were not properly recorded in violation of GAAP.

58.     Director Defendants had ample opportunity to discuss this material information with the Options Defendants at any Board meetings that occurred during the Relevant Period, as well as at meeting of committees of the Board.

59.     Despite these duties, Director Defendants negligently, recklessly, and/or intentionally caused or allowed, by their actions or inactions, improper statements to be disseminated by Monster to the investing public and the Company's shareholders during the Relevant Period.

60.     Instead of properly disclosing these improper stock option backdating practices and the corresponding understatement of compensation costs, Director Defendants caused or allowed these practices to continue unabated throughout the Relevant Period.

## DERIVATIVE ACTION AND DEMAND FUTILITY ALLEGATIONS

61.     Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress the injuries suffered, and to be suffered, by the Company as a direct result of the breach of fiduciary duty, gross mismanagement and unjust enrichment alleged herein. The Company is named as a nominal Defendant solely in a derivative capacity.

62.     Plaintiff will adequately and fairly represent the interest of the Company in enforcing and prosecuting its rights.

63.     Plaintiff did not make demand on the Board of Directors of the Company to bring this action on behalf of the Company because such a demand would have been a futile, wasteful and useless act for the following reasons:

(a)     All of the Director Defendants authorized, approved, ratified or have failed to rectify some or all of the back-dated stock option grants at issue here and are named as Defendants herein;

(b)     The Compensation Committee was at all relevant times responsible for overseeing the Company's compensation, employee benefit and stock option plans.  It was also responsible for supervising incentive compensation programs for the Company's employees.  The members of the Compensation Committee, and the Board by its approval of their

recommendations, enabled, or through conscious abdication of duty, permitted the Company to back-date stock options issued to the Options Defendants. By such actions, Defendants breached their fiduciary duties to the Company. The back-dating of stock options was in direct violation of the stock option plans. Thus, there is reasonable doubt that the members of the Compensation Committee are disinterested;

(c)     The Audit Committee is responsible for assisting the Board in fulfilling its responsibilities for general oversight of the integrity of Monster's financial statements, Monster's compliance with legal and regulatory requirements, the independent auditors' qualifications and independence, the performance of Monster's internal audit function and independent auditors, and risk assessment and risk management. Defendants Gaulding, Kaufman and Kramer were responsible, as members of Monster's Audit Committee, for insuring that the Company's internal controls were adequate and that the Company's quarterly and annual financial statements were accurate. Monster's internal controls, however, were materially inadequate as evidenced by its executives' improper backdating of stock option grants. As a result of this improper conduct, the Company's financials were rendered inaccurate because those financials did not account for the true amount of compensation being granted to Monster's executives. Accordingly, there is reasonable doubt that Defendants Gaulding, Kaufman and Kramer are disinterested because they face a substantial likelihood of liability for their breaches of fiduciary duty to Monster. Thus, demand is futile as to Defendants Gaulding, Kaufman and Kramer.

(d)     The back-dating of options as alleged herein was unlawful and not within Defendants' business judgment to acquire, authorize, ratify or facilitate;

(e)     There was no basis or justification for back-dating the stock options. It was designed solely to benefit the Options Defendants in a manner that was inconsistent with the

Company's public disclosures, to the detriment of the Company.   Hence, the transactions constituted a waste of corporate assets, and could not have been the product of the proper exercise of business judgment by the Defendants;

(f)     During the Relevant Period, the Director Defendants authorized the filing of Proxy Statements, in support of their nomination as Directors, which failed to disclose that the Options Defendants' stock options had been back-dated.   They also authorized the filing of shareholder approved stock option plans, which misrepresented that the options carry the stock price of the day of the award.   Any suit by the Director Defendants to remedy the wrongs complained of herein could also expose them to suit for securities fraud and proxy violations; thus, they are hopelessly conflicted in making any supposedly independent determination of a demand that they cause the Company to bring this action;

(g)     All of the Director Defendants signed one or more of the Company's Annual Reports during the Relevant Period, which contained the Company's financial statements, which failed to account for the back-dated stock options as compensation and an expense of the Company. As a result, those financial statements of the Company may have overstated its profits and may need to be restated.   Any suit by the Director Defendants to remedy the wrongs complained of herein could also expose them to suit for securities fraud; thus, they are hopelessly conflicted in making any supposedly independent determination of a demand that they cause the Company to bring this action;

(h)     All of the Director Defendants participated in, approved, or through abdication of duty, permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company stockholders and/or acting with

negligence and gross negligence disregarded the wrongs complained of herein, and therefore are not disinterested parties;

(i)     On information and belief, Director Defendants are protected against liability for breaches of fiduciary duty alleged in the Complaint by directors' and officers' liability insurance policies.  As a result, if Director Defendants were to cause the Company to sue itself or certain officers of Monster, there would be no directors' and officers' insurance protection.  This is yet another reason why Director Defendants are hopelessly conflicted in making any independent determination that would cause the Company to bring this action;

(j)     Despite Defendants' breaches of duty, the Board of Directors did not recommend that any Defendant be relieved of his or her duties as director.  By maintaining the *status quo* in light of these breaches of duty, the entire Board failed to exercise proper business judgment and therefore lacks independence;

(k)     The Board of Directors did not require that the Options Defendants immediately disgorge all of their ill-gotten gains from the improper manipulation of their stock option grants and other misconduct, did not require them to return all unexecuted stock options to the Company, and did not require them to disgorge their bonuses and equity-based compensation to the Company, despite their indisputable breaches of fiduciary duties, which worked a direct harm to the Company.

## COUNT I

### Against All Defendants For Violations of Section 14(a) of the Exchange Act

64.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

65.     Director Defendants issued, caused to be issued and participated in the issuance of materially false and misleading statements to shareholders which were contained in the Company's Definitive Proxies filed on April 29, 2004, April 30, 2003 and April 26, 2002, specifically, in their respective sections disclosing executive compensation, which each misrepresented or failed to disclose, *inter alia,* the facts set forth above. By reasons of the conduct alleged herein, each Director Defendant violated Section 14(a) of the Exchange Act. The correct information would have been material to the Company's shareholders in determining whether to elect directors to manage their company.

66.     Plaintiff, on behalf of the Company, thereby seeks to void the election of Director Defendants based upon the misleading and incomplete proxy materials, and to recover damages caused by Defendants' failure to disclose the improper compensation described herein.

## COUNT II

### Against All Defendants for Breach of Fiduciary Duty

67.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

68.     The Defendants owe the Company fiduciary obligations. By reason of their fiduciary relationships, the Defendants owed and owe the Company the highest obligation of good faith, fair dealing, loyalty and due care.

69.     Each of the Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision by, *inter alia*, (i) the reckless disregard with which they published the financial statements of Monster that did not conform to GAAP; (ii) the reckless disregard with which they supervised the audits and reviews of Monster's financial statements and internal controls and procedures; and (iii) the violation of their duties of loyalty in failing to detect, prevent and/or disclose Monster' accounting

misstatements, and the weaknesses in the internal controls and procedures of the Company, as previously described herein.

70.     Each Defendant also each owed Monster a duty to test, oversee and monitor their systems of internal disclosure, financial and accounting controls, governance procedures and disclosure procedures and to ensure that they were functioning in an effective manner and in compliance with, *inter alia,* the Sarbanes-Oxley Act of 2002.

71.     The Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

72.     Each of the Defendants authorized, or by abdication of duty, permitted the stock options granted to the Options Defendants to be back-dated. These actions were not a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

73.     As a direct and proximate result of the Defendants' breaches of their fiduciary duties, Defendants have caused, and will continue to cause, the Company to suffer substantial monetary damages as a result of the wrongdoing described herein, as well as further and even greater damage in the future, including damage to the Company's reputation, business and good will.

74.     The Company has been directly and substantially injured by reason of the Defendants' intentional breach and/or reckless disregard of their fiduciary duties to the Company.  Plaintiff, as a shareholder and representative of the Company, seeks damages and other relief for the Company, in an amount to be proven at trial.

## COUNT III

### Against All Defendants for Gross Mismanagement

75.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

76.     By their actions alleged herein, the Defendants abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of the Company in a manner consistent with the operations of a publicly held corporation.

77.     As a direct and proximate result of the Defendants' gross mismanagement and breaches of duty alleged herein, the Company has sustained and will continue to sustain significant damages in the millions of dollars.

78.     As a result of the misconduct and breaches of duty alleged herein, the Defendants are liable to the Company.

## COUNT IV

### Against The Options Defendants for Unjust Enrichment and Breach of the Duty of Loyalty

79.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

80.     As a result of the back-dating of the options granted to them, the Options Defendants have been and will continue to be unjustly enriched at the expense of and to the detriment of the Company.

81.     Accordingly, this Court should order the Options Defendants to disgorge all profits, benefits and other compensation obtained by the Options Defendants, from their wrongful conduct and fiduciary breaches described herein, and should order the options held by the Options Defendants, which have not yet been exercised, to be repriced at the market price of the Company's stock on the dates the Court finds that those options were actually, in fact, granted.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff demands judgment as follows:

A.      Against all of the Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Defendants' breaches of fiduciary duties, gross mismanagement, and unjust enrichment;

B.      Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including declaring the improper compensation awards complained of herein to be null and void; and attaching, impounding, imposing a constructive trust on or otherwise restricting the proceeds of Defendants' trading activities or their other assets so as to assure that plaintiff on behalf of the Company have an effective remedy;

C.      Awarding to the Company restitution from the Options Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the Options Defendants as a result of the conduct alleged herein;

D.      Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all claims so triable.

Dated:  June 15, 2006

Respectfully submitted,

**WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLP**

By:

Lawrence P. Kolker (LK-6432)
Gustavo Bruckner (GB-7701)
Rachel S. Poplock (RP-3782)

270 Madison Avenue
New York, New York 10016
Telephone:  212/545-4600
Facsimile:  212/545-4653

**LAW OFFICES OF
JACOB T. FOGEL, P.C**
Jacob T. Fogel
32 Court Street – Suite # 602
Brooklyn, New York 11201
Telephone:  718/221-5552
Facsimile:  718/875-4500